

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00165-CV

_____

IN THE MATTER OF R.S.

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-118013-22

Before Sudderth, C.J.; Birdwell and Walker, JJ.
Memorandum Opinion by Justice Birdwell
Dissenting Memorandum Opinion by Justice Walker

**MEMORANDUM OPINION**

R.S. appeals from an order committing him "to the care, custody[,] and control of the Texas Juvenile Justice Department [(TJJD)] . . . [f]or an indeterminate period of time not to exceed the time" he turns nineteen or is "duly discharged in compliance with the supervision of [the] Human Resources Code." *See* Tex. Fam. Code Ann. §§ 51.03(a)(1), 54.03. *See generally* Tex. Hum. Res. Code Ann. §§ 245.001–.151. R.S. does not list a specific issue on appeal but contends in his argument that the evidence is legally and factually insufficient to support committing him to TJJD instead of putting him on probation and placing him either at home or outside the home in one of two non-TJJD placement facilities to which he had been accepted. We reverse the trial court's order and remand this case for a new disposition hearing.

**Procedural Background**

After the State filed a petition to adjudicate R.S. guilty of delinquent conduct, R.S. signed a judicial confession stipulating that in 2021 he had engaged in delinquent conduct by—on the same day—committing one first-degree-felony aggravated robbery and four second-degree-felony aggravated assaults with a deadly weapon. *See* Tex. Penal Code Ann. §§ 22.02(a)(2), 29.03(a)(2). Based on R.S.'s judicial confession and subsequent pleas of true to the delinquent-conduct allegations in the State's petition, the trial court found that R.S. had engaged in delinquent conduct. *See* Tex. Fam. Code Ann. §§ 51.03(a)(1), 54.03.

The trial court then held a disposition hearing. *See id.* § 54.04(a). After hearing testimony from three witnesses, the trial court ultimately found that R.S. is a child in need of rehabilitation; that even though reasonable efforts had been made to prevent or eliminate the need for him to be removed from his home, he could not be provided the quality of care and level of supervision in the home that he would need to be able to meet the conditions of probation; that he has specific behavioral-health or other special needs that cannot be met with the community's resources; and that it would be in R.S.'s best interest to be placed outside the home. *Id.* §§ 54.04(c), (d)(2), (i)(1), 54.04013. Despite hearing evidence that two potential alternative placements—one at a secure facility and another at a nonsecure facility—would be able to meet R.S.'s needs, the trial court determined that he should be committed to TJJD.

**Standard of Review and Applicable Law**

A juvenile court has considerable discretion to determine the suitable disposition for a child who has been adjudicated as having engaged in delinquent conduct. *In re D.T.*, No. 02-20-00312-CV, 2021 WL 5028769, at *1 (Tex. App.—Fort Worth Oct. 28, 2021, no pet.) (mem. op.). A juvenile court abuses that discretion when it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Id.* It does not abuse its discretion simply by basing its decision on conflicting evidence. *Id.* Thus, we may not conclude that a juvenile court abused its discretion so long as some evidence of substantive and probative character exists to support its decision. *Id.* However, a juvenile court abuses its discretion if it orders a

3

child committed to TJJD without evidence to support the statutorily required predicate findings. *See In re J.C.*, No. 02-18-00038-CV, 2018 WL 2701613, at *2 (Tex. App.—Fort Worth June 5, 2018, no pet.) (mem. op.).

In conducting our review of a disposition order, we engage in a two-pronged analysis: (1) did the juvenile court have sufficient information upon which to exercise its discretion, and (2) did it err in its application of discretion? *D.T.*, 2021 WL 5028769, at *1. In doing so, we apply the civil standards of review for legal and factual evidentiary sufficiency. *In re B.R.*, No. 02-19-00328-CV, 2020 WL 3969556, at *2 (Tex. App.—Fort Worth June 18, 2020, no pet.) (mem. op.).

When determining whether legally sufficient evidence supports the finding under review, we consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *In re M.E.*, No. 02-14-00051-CV, 2014 WL 7334990, at *2 (Tex. App.—Fort Worth Dec. 23, 2014, no pet.) (per curiam) (mem. op.). Anything more than a scintilla of evidence supporting a finding renders the evidence legally sufficient. *Id.*

When reviewing whether factually sufficient evidence supports a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak or so contrary to the overwhelming weight of all the evidence that the answer should be set aside and a new trial ordered. *Id.*

4

Upon making the required findings that R.S. should be subject to a hearing to determine disposition, the trial court was authorized by the Family Code to either (1) place him on probation at home or outside the home or (2) commit him to TJJD. *See* Tex. Fam. Code Ann. § 54.04(d)(1)–(2). No disposition placing a child on probation outside the child's home or committing a child to TJJD is permitted unless the factfinder finds that it is in the child's best interest to be placed outside the child's home; reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the child's home; and the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation. *Id.* §§ 54.04(c), (d)(1)(B), (i).[1] Probation outside the home may be in a suitable foster home, a suitable public or private residential treatment facility, or a suitable public or private post-adjudication secure correctional facility as permitted under the Texas Family Code. *See id.* § 54.04(d)(1)(B)(i), (ii), (iii); *In re J.V.M.*, 318 S.W.3d 444, 448 (Tex. App.—El Paso 2010, no pet.).

---

[1]The Stipulation of Evidence and Judicial Confession R.S. signed stated that he "agree[d] to a disposition of . . . OPEN [to] DISPOSITION," but then it also included stipulations to the three required findings for placement outside the home; thus, it is unclear whether he agreed to a truly open disposition. Nevertheless, because R.S. challenges the trial court's ultimate decision to commit him to TJJD, we address his complaint.

But to place a child in TJJD custody, Section 54.04013 requires another

finding,[2] which the trial judge made in this case:

> Notwithstanding any other provision of this code, after a disposition hearing held in accordance with Section 54.04, the juvenile court may commit a child who is found to have engaged in delinquent conduct that constitutes a felony offense to the Texas Juvenile Justice Department without a determinate sentence if the court makes a special commitment finding that *the child has behavioral health or other special needs that cannot be met with the resources available in the community.* The court should consider the findings of a validated risk and needs assessment and the findings of any other appropriate professional assessment available to the court.

Tex. Fam. Code Ann. § 54.04013 (emphasis added); *see id.* § 54.04(d)(2) (listing, as one

of three possible dispositions, commitment to TJJD without a determinate sentence

"*if . . .* the court or jury made a special commitment finding under Section 54.04013"

(emphasis added)); *In re J.M.G.*, No. 06-16-00011-CV, 2016 WL 9175816, at *1 (Tex.

App.—Texarkana Nov. 29, 2016, no pet.) (mem. op.) (stating that Section 54.04013

---

[2]This section applies to conduct that occurred on or after September 1, 2017. *See* Act of May 31, 2015, 84th Leg., R.S., ch. 962, § 8, 2015 Tex. Gen. Laws 3403, 3407. Legislative history for the bill in which Section 54.04013 was enacted states that "[i]t establishes a new sentence scheme for sending indeterminate youth to the state facilities, requiring a valid needs assessment and determination that the needs of the youth cannot be met with the resources available within the community." Tex. S. Comm. on Crim. Just., Bill Analysis, Tex. S.B. 1630, 84th Leg., R.S. (2015). This "new sentence scheme" was enacted in response to a Justice Center of the Council for State Government study that found "juveniles under community-based supervision are far less likely to reoffend than youth with very similar profiles who are confined in Texas Juvenile Justice Department (TJJD) facilities." *Id.* The bill analysis recites that "the study results show that youth incarcerated in state facilities are 21 percent more likely to be rearrested than those who remain under supervision closer to home in local county programs." *Id.* Accordingly, Section 54.04013 and other changes in the bill were intended to "continue the movement of the Texas juvenile justice system from the 1950's model of large rural institutions into a regional system that supervises and treats a youth closer to the youth's home community." *Id.*

requires the trial court to make the special commitment finding before committing a juvenile to TJJD without a determinate sentence); *see also In re T.A.W.*, 234 S.W.3d 704, 708 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (op. on reh'g) (Frost, J., concurring) (noting that Section 54.04(d) "outline[s] the different options for disposition and the findings *required* for each" (emphasis added)).[3]

"The [TJJD] is the most severe form of incarceration in the juvenile justice system, and it is neither reasonable nor appropriate in the area of juvenile law to use the final, most restrictive form of detention in all situations." *In re W.B.G.*, 598 S.W.3d 367, 372 (Tex. App.—Texarkana 2020, no pet.) (quoting *J.M.G.*, 2016 WL 9175816, at *2). Nevertheless, for purposes of the best-interest, reasonable-efforts, and unsuitability-of-the-home-for-probation findings, a trial court is not required to exhaust all possible alternatives before committing a juvenile to TJJD custody. *In re K.L.*, No. 02-17-00226-CV, 2018 WL 1755225, at *5 (Tex. App.—Fort Worth Apr. 12, 2018, no pet.) (mem. op.).[4] *But cf. In re J.E.N.*, No. 11-21-00189-CV, 2022 WL 4541759, at *6–7 (Tex. App.—Eastland Sept. 29, 2022, no pet.) (mem. op.) (holding that trial judge abused discretion by ordering J.E.N. committed to TJJD when no

---

[3]R.S. does not expressly challenge this finding, but he does so implicitly by arguing that the factfinder should not have ordered him committed to TJJD.

[4]In other parts of the Family Code, the best interests of children are often paramount, but in the Juvenile Justice Code, the best interests of children who engage in serious and repeated delinquent conduct are superseded to the extent they conflict with public safety. *In re J.P.*, 136 S.W.3d 629, 633 (Tex. 2004).

alternative-placement efforts were made; thus, insufficient evidence supported trial court's reasonable-efforts finding).

## Evidence at Disposition Hearing

The trial judge took judicial notice of the court's file[5] and of prior hearings in the case over which he had presided, "to the exclusion of any statements made by [R.S.] during any detention hearings." Therefore, the judge knew the nature of the offenses to which R.S. had judicially confessed. Additionally, the State explored the nature of those offenses at the disposition hearing.

R.S. had used Instagram on his iPhone[6] to meet a group of people, ostensibly to buy shoes. Instead, R.S. robbed the driver at gunpoint, stealing the victim's car and ten pairs of shoes. R.S. also held the other occupants of the car, some of whom were juveniles, at gunpoint. R.S. claimed to have bought the gun, a Glock, from a homeless man for $350; he said he sold some different shoes for the money to buy the gun.

R.S. admitted that after committing the robbery and aggravated assaults—but before being detained for them—he had been involved in another incident in which he tried to sell the Glock outside his school. The man to whom he tried to sell the gun

---

[5]The trial court also took judicial notice of the sealed social history, which we have reviewed. *See* Tex. Fam. Code Ann. §§ 54.04(b), 54.04013. The report includes a victim statement, placement summary, and detailed description of R.S's background and the results of his psychological testing.

[6]The State got R.S. to agree during cross-examination that he could have sold his iPhone for extra money "instead of holding a family at gunpoint."

took it without giving R.S. any money; when R.S. grabbed his phone and the gun, the man shot R.S. in the finger.[7]

Shelly Brasel, R.S.'s assigned court-intake officer, testified that R.S. lived with his grandmother, who was supportive of him. His grandfather—who was divorced from his grandmother and with whom R.S. did not live—had attended several of R.S.'s hearings, and his basketball coaches had spoken on his behalf. Thus, Brasel opined that R.S. had support at home and at school.

Brasel testified that R.S. was "of low cognitive ability." R.S.'s counsel asked the trial judge to take into account the discussion of R.S.'s "cognitive proficiency" in the social history provided to the court, which counsel stated "may shed some light on some of this very poor decision-making this young man has made." R.S. explained that he was far behind in school because he and his mother had been homeless before he moved in with his grandmother.

Before committing the delinquent conduct to which he pleaded true, R.S. had successfully completed probation[8] for unlawfully carrying a firearm. But Brasel

---

[7]At the time of the disposition hearing, the man had been charged with aggravated robbery. R.S. claimed that the Glock was not loaded when he brought it to school—on a weekend while he was at basketball practice—but that the man buying it had brought the ammunition and loaded the gun while sitting in his own car.

[8]During that probation, he was "part of the TCAP program," performed community service, and wore an electronic monitor "for a period of time." *See In re G.L.C.P.*, No. 2-06-293-CV, 2007 WL 1377733, at *1 n.2 (Tex. App.—Fort Worth May 10, 2007, no pet.) (per curiam) (mem. op.) ("TCAP is a home-based program which

9

admitted that, based on the delinquent conduct to which R.S. had pleaded, he had not been rehabilitated successfully after his probation. She admitted that R.S.'s successful completion of probation showed that "he has the capability to behave when he wants to." At the time of the disposition hearing, R.S. had been in detention almost five months and was on a "Level 1 outstanding," meaning he was "following all the instructions and following all the rules." He had not committed any new offenses and had been respectful.

R.S. testified and first apologized to his grandparents: "I'm sorry for doing something that y'all hadn't raise[d] me to do." He claimed to be "serious and sincere in [his] apology." R.S. said that his grandparents had always taught him to work for what he wanted. Instead, he said that he committed the offenses because he wanted to buy his grandfather and younger siblings Christmas presents.

R.S. testified that he had learned "a different way" since being detained: to "try to buy nothing at all or get a job." Although he had briefly worked as a cook and dishwasher and had quit that job because basketball was interfering with his work, he was willing to do that job again.

Shequita Burrell, a placement officer for Tarrant County Juvenile Services, testified that she had conducted a placement search for R.S. He had been accepted into a nonsecure facility where he would participate in weekly group and individual

---

utilizes paid, trained adults (advocates) who live in the same communities as the youth to develop relationships with at-risk youth and families.").

therapy and monthly family therapy; would be enrolled in school; and would have the opportunity to enroll in programs that would allow him to work, get on-the-job training, prepare for jobs and interviews, and obtain identification and a food handler's license.[9] R.S. had also been accepted into a secure facility similar to the Tarrant County juvenile detention center where he would also do weekly individual and group therapy, monthly family therapy, and recover school credits. He would also be able to complete any ordered community-service hours and have his medications managed. In other words, both facilities provided essentially the same services except that vocational training was available only at the nonsecure facility.

Burrell agreed that getting work experience would be valuable for R.S. Brasel also agreed; she thought that, in light of R.S.'s being from a low- to mid-income family, he would benefit from job training and would have better opportunities at the nonsecure facility. Although Brasel acknowledged that the offenses R.S. committed are of the type that would "make the community feel unsafe," she nevertheless thought that both the secure and nonsecure facility could contribute to R.S.'s rehabilitation. R.S. wanted the judge to "make the right decision" and send him to the nonsecure facility so that he would have more opportunities. He was willing to "stick it out" and do what he needed to do to be successful there. R.S. agreed to ask for help when things got hard or when he felt like giving up.

---

[9]The record also shows that at this facility, his medications and medical needs would be managed.

The State advocated that R.S. be placed in the secure facility where the community would be safe from him and where his cognitive issues and mental health could be addressed. The State emphasized R.S.'s good behavior while in detention as evidence that "he can thrive in a secure environment." R.S. argued that the job-training programs at the nonsecure facility made it the better choice for him. He also argued that being there would keep "him away from the really bad kids." R.S. did not advocate being placed back in his grandmother's home.

The behavioral evaluation in the social-history report included the psychologist's conclusion that R.S. has antisocial tendencies and was thus at a high risk for future violence "without successful intervention." However, the psychologist also concluded that R.S. was at "potential risk of . . . having adjustment problems to institutional living" and recommended that he "be considered for placement in a long-term residential treatment program where he might receive strict supervision in a structured and supportive therapeutic environment. The psychologist further recommended individually tailored therapy, psychiatric care, "academic remediation services," and participation in a violence-prevention program "through a strict behavioral conditioning program that utilizes a social learning modality in reinforcing prosocial attitudes in community living."[10]

---

[10]Although we note that TJJD is required to provide an educational program for residents, the record does not contain evidence about any services available to R.S. at TJJD. *See In re D.J.P.*, No. 02-13-00156-CV, 2014 WL 173490, at *7 (Tex. App.—Fort Worth Jan. 16, 2014, no pet.) (per curiam) (mem. op.) ("While . . . there was little

12

Notably, there was no evidence that the level of security at the secured facility was insufficient to protect either the public or—relevant to Section 54.04013—to meet R.S.'s need for a "long-term residential treatment program where he might receive strict supervision in a structured and supportive therapeutic environment." Nor was there any evidence comparing or contrasting that security level with TJJD's. In fact, the evidence showed that the secure facility was "a lockdown facility kind of like [the Tarrant County] detention center," where R.S. had been "following all the instructions and following all the rules."

---

evidence presented at the disposition hearing about the educational programs available at TJJD or the treatment that he could receive there, the TJJD is statutorily required to provide an educational program that requires all residents to participate." (citing 2013 version of 37 Tex. Admin. Code § 343.670 (2022) (Tex. Juvenile Justice Dep't, Educational Program), which requires facility administrator to "ensure there is an educational program that requires all residents to participate")); *cf. In re J.P.*, No. 01-20-00072-CV, 2021 WL 2231259, at *5–6 (Tex. App.—Houston [1st Dist.] June 3, 2021, no pet.) (mem. op.) (holding evidence sufficient to support educational-need and best-interest findings despite lack of TJJD-specific testimony when J.P. had been unable to control himself in detention, and probation officer testified generally that J.P.'s behavioral problems and mental-health issues could be addressed by TJJD, and also citing cases with similar facts); *In re J.F.S.*, No. 2-04-059-CV, 2005 WL 375152, at *1–3 (Tex. App.—Fort Worth Feb. 17, 2005, no pet.) (per curiam) (mem. op.) (holding same when juvenile had "received every rehabilitative resource available in Tarrant County" and "continued to engage in criminal conduct and violate the terms of his court-ordered probation"). *But cf. In re J.R.D.*, No. 07-21-00174-CV, 2022 WL 2237838, at *3 (Tex. App.—Amarillo June 22, 2022, no pet.) (mem. op.) (recounting TJJD-specific testimony supporting TJJD-commitment disposition); *In re A.W.B.*, 419 S.W.3d 351, 361 (Tex. App.—Amarillo 2010, no pet.) (affirming commitment order when evidence showed that applicable services from Texas Youth Commission were the same as locally available rehabilitative services).

## Analysis

Generally, a trial court does not abuse its discretion in rendering a commitment order when a delinquent juvenile has engaged in some type of violent activity that makes the juvenile potentially dangerous to the public. *B.R.*, 2020 WL 3369556, at *6 (reviewing trial court's "reasonable efforts" finding but not a Section 54.04013 finding). Here, R.S. threatened five people at gunpoint to steal a car and shoes. Within the preceding year, he had completed probation for unlawfully carrying a gun; both offenses occurred while he was living with his grandmother.[11] The evidence shows that instead of being rehabilitated by his prior at-home probation, he escalated his behavior. Thus, the public's need for protection was high, and the evidence supported the trial court's Section 54.04(i) findings that in-home probation would not be appropriate.

But to uphold the trial court's order committing R.S. to TJJD, we must also consider whether the evidence supports the trial court's finding that R.S.'s behavioral-health or other special needs could not be met with non-TJJD community resources. The evidence showed that R.S. had a strong need for long-term structure and direct

---

[11]R.S. distinguishes this case from *In re A.G.N.*, No. 07-07-00312-CV, 2008 WL 2511197, at *1 (Tex. App.—Amarillo June 24, 2008, pet. denied) (mem. op.), in which the court affirmed an order committing A.G.N. for an indeterminate time. In that case, the appellate court had noted that A.G.N. "lacked family support"; R.S. notes that, here, although he has "a long history of being in an unstable home environment," his environment had "changed when his grandmother more recently took custody of him," showing that R.S. "had a home where he could be properly supervised now." But this argument ignores that R.S.'s most serious delinquent conduct (from which the trial court determined the public had a high need for protection and which involved firearms possession, display, and threats) occurred while he was living with his grandmother.

14

supervision and that he had done well in juvenile detention. He also had a high need for psychiatric care, behavioral correction, and academic remediation, rather than job-specific training. Thus, the evidence supports a disposition at a secure facility rather than a nonsecure facility.

But nothing in this record showed that the secure facility could not meet R.S.'s behavioral-health or other special needs, particularly his needs for strict supervision and intensive therapy in a "supportive therapeutic environment." Unlike in the two other reported cases affirming TJJD commitment based on a Section 54.04013 finding, *see In re H.C.*, Nos. 02-18-00230-CV, 02-18-00231-CV, 02-18-00232-CV, 2019 WL 1185089, at \*18–19 (Tex. App.—Fort Worth Mar. 14, 2019, no pet.) (per curiam) (mem. op.); *J.M.G.*, 2016 WL 9175816, at \*2–4,[12] the evidence here did not show that R.S. had been offered or had participated in the same or similar recommended community services without success. In fact, the evidence showed that his need for supervision had been met while in detention. And no evidence showed that he had ever been placed in a secure environment where he also had the recommended intensive therapy available to him. The evidence instead showed that such a facility was available that was capable of meeting R.S.'s needs for a secure, structured environment as well as for education and

---

[12]*Cf. In re H.A.*, No. 02-19-00192-CV, 2019 WL 6904549, at \*4 (Tex. App.—Fort Worth Dec. 19, 2019, no pet.) (mem. op.) (rejecting, for purposes of reasonable-efforts finding, argument that "a juvenile court always lacks legally or factually sufficient evidence to make a reasonable-efforts finding if the State does not present evidence at the disposition hearing showing what specific services or outside-the-home placement options the juvenile department could offer to the delinquent juvenile").

intensive therapy. In other words, all of the evidence showed that R.S.'s needs could be met in the secure facility, and there was no controverting evidence on which the trial court could have based its Section 54.04013 finding.

Although a trial court is not required to exhaust all possible alternatives before committing a juvenile to TJJD, the trial court cannot commit a juvenile to TJJD based upon a record that does not support the required juvenile-specific (as opposed to community-safety specific) Section 54.04013 finding. Here, the evidence is insufficient to support the trial court's finding that community resources could not meet R.S.'s behavioral-health or other special needs, given the then availability of the secure facility that had programs available according to the psychological evaluation's specific recommendations.

## Conclusion

Because no evidence supports the trial court's Section 54.04013 finding, we therefore conclude that the trial court abused its discretion by committing R.S. to TJJD. We reverse the trial court's order and remand the case for a new disposition hearing. *See* Tex. Fam. Code Ann. § 56.01(i) (requiring remand when reversing disposition); *In re L.F.R.*, No. 02-12-00454-CV, 2013 WL 1830325, at *1 (Tex. App.—Fort Worth May 2, 2013, no pet.) (mem. op.) (remanding even when holding evidence legally insufficient to support disposition finding).

/s/ Wade Birdwell
Wade Birdwell

16

Justice

Delivered: December 8, 2022